Filed 7/2/14  P. v. Bhatia CA2/3
Opinion following recall of remittitur

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B240015 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA070208) |
| v. | |
| NEELAM BHATIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Harvey Giss, Judge.  Affirmed with directions.

Johanna R. Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Appellant Neelam Bhatia appeals from the judgment entered following her convictions by jury on six counts of grand theft of personal property exceeding $400 in value (Pen. Code, § 487, subd. (a); counts 1 – 6) with findings she took property exceeding $200,000 in value (Pen. Code, § 12022.6, subd. (a)(2)) and the crimes had the material element of embezzlement and involved a pattern of related felony conduct involving the taking of more than $500,000 (Pen. Code, § 186.11, subd. (a)(2)). The court sentenced appellant to prison for nine years eight months. We affirm the judgment with directions.

## FACTUAL SUMMARY

1. *People's Evidence*.

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence, the sufficiency of which is undisputed as to all counts, established as follows. Appellant was a real estate agent with Click and List Realty, Inc. (Click) located in Granada Hills. Click also handled escrows. A California Secretary of State form reflected appellant was the chief financial officer (CFO) and secretary of Click. Codefendant Leroy Sennette[1] was the broker and chief executive officer of Click. As of May 2008, appellant and Sennette were signatories on Click's operating account at Bank of the West (West). In April 2009, appellant was removed as a signatory.

a. *Evidence as to Each of Counts 1 Through 6*.

(1) *Count 1 (Victim Porter Ranch Development Co.)*.

In October 2008, Nilesh and Dahshita Patel agreed in writing to buy property in Northridge from Shapell Industries, also known as Porter Ranch Development Company (Porter). Appellant, the Patels's real estate agent, chose Click as the escrow company. On December 8, 2008, a title company wired $573,253 into Click's operating account at West, and the Patels became legal owners of the property. Porter never received the

---

[1]     Sennette is not a party to this appeal.

amount due for the property. Appellant committed grand theft of money exceeding $400 in value (grand theft) by embezzling the money (count 1).

(2) *Counts 2 and 3 (Victims Garcia-Alonso and Martinez).*

In January 2009, Rodrigo Garcia-Alonso (Garcia-Alonso) and his wife, Maria Martinez, agreed in writing to buy a house in Northridge. Appellant represented the seller. On January 19, 2009, Garcia-Alonso, using money he had saved over 20 years, gave to appellant at her office a $19,800 deposit check, payable to Click. On January 28, 2009, the check was deposited into Click's operating account at West. On March 24, 2009, Martinez gave appellant a $112,200 cashier's check, payable to Click for the balance of the down payment. The cashier's check was deposited that day into the same account. Appellant committed grand theft of the proceeds of the deposit check and cashier's check (counts 2 and 3, respectively).

(3) *Counts 4 and 5 (Victims Bidgoli and Houshmand).*

In April 2009, Amir Bidgoli and his wife, Fatemeh Houshmand, agreed in writing to buy a house in Porter Ranch. Appellant was the seller's agent. Appellant told the seller to choose Click as the escrow company. On April 10, 2009, Houshmand gave appellant a $42,000 deposit check. Appellant then gave the check to Joe Panichi, Click's escrow officer. On April 14, 2009, the check was deposited into Click's operating account at West. On August 19, 2009, Houshmand, at the direction of appellant and Panichi, wired $198,238, the balance of the down payment, into Click's operating account at J.P. Morgan Chase Bank (Chase). Appellant committed grand theft of the proceeds of the deposit check and of the $198,238 (counts 4 and 5, respectively).

(4) *Count 6 (Victim Shelden).*

About July 2009, Ross Shelden agreed to buy a house in Calabasas. A Click employee represented the seller. On July 22, 2009, Shelden wrote a $39,000 deposit check to Click and List Escrow. On July 23, 2009, the check was deposited into Click's operating account at West. In September 2009, Shelden received a deposit receipt indicating his money had been deposited into Comerica Bank. Appellant committed grand theft of the proceeds of the check (count 6).

b. *Other Evidence*.

In September 2009, Michael Lewis agreed in writing to buy two Lancaster duplexes appellant had listed. Each was $75,000. On September 12, 2009, Lewis gave appellant two $20,000 deposit checks, payable to Click. On September 14, 2009, the checks were deposited into Click's operating account at Chase. In November 2009, appellant told Lewis to bring the final funds for one of the duplexes. Lewis did so, giving appellant a $55,000 check. Appellant committed grand theft of the proceeds of the two deposit checks.[2]

2. *Defense Evidence*.

In defense, appellant claimed others were responsible for the fraudulent transfers of funds and, asserting a claim-of-right defense, she maintained that money transferred from Click's account to her T. D. Ameritrade (Ameritrade) account represented commissions owed to her.

## ISSUES

Appellant claims (1) the trial court committed misconduct, (2) appellant's convictions on counts 2 through 6 must be reversed, (3) if not, appellant's convictions on counts 3 and 5 must be reversed, (4) appellant was denied effective assistance of counsel, (5) the prosecutor committed misconduct, and (6) cumulative prejudicial error occurred. Respondent claims the abstract of judgment must be corrected.

## DISCUSSION

1. *Nonprejudicial Judicial Misconduct Occurred.*

Appellant claims the trial court's examination of witnesses at trial constituted misconduct. She cites several alleged instances we discuss below. We italicize below the challenged questions or statements emphasized by appellant in her opening brief. As discussed below, we conclude nonprejudicial judicial misconduct occurred.

a. *Pertinent Facts.*

---

[2]  Appellant concedes evidence was introduced that between December 2008 and September 2009, about $1.6 million was wired from Click's operating account into an Ameritrade account with respect to which appellant was the sole beneficiary.

(1) *Alleged Judicial Misconduct During the Presentation of the People's Evidence.*

(a) *Calapini's Testimony.*

Morick Calapini, a customer service manager for West, testified for the People about online transactions. Appellant sought to demonstrate Sennette and appellant had control of the West operating account and Sennette probably made the transfers from that account after appellant was removed as a signatory. During Calapini's testimony, the court asked if someone could still transfer money online *nefariously or improperly* after their name had been taken off the account. Calapini testified the online information code would not change and the court asked, "*So somebody that already knew that could still work that* . . . [¶] . . . [¶] . . . *to their benefit?*" (Italics added.)

Calapini testified that because Sennette was the only signatory, Sennette was probably the person who came to the bank and made a particular withdrawal, "but there is [*sic*] instances where there is a transaction where somebody knows somebody." The court asked, "So you're saying *the bank could screw up* and . . . a teller or some bank officer, because they knew someone to be a signatory in the past, might assume that that person was still the signatory?" (Italics added.)

Calapini testified to the effect there was no information as to who had made an August 3 wire transfer. The court commented, "So one has to assume in theory that it was only the signatory that was permitted to do [a wire transfer]? [¶] . . . [¶] . . . [B]ut you told us before that that *could be circumvented*. Someone in the bank could make a mistake and assume, because that person was a second person . . . on the card in the past they still may be on." (Italics added.)

Calapini testified to the effect Sennette was the only person authorized to make four June 2009 outgoing wire transfers from West. The court then elicited testimony from Calapini to the effect the money from those four transactions went into the Ameritrade account. After the court said "okay," Calapini testified to the effect appellant was the beneficiary. Calapini later similarly testified only Sennette could have made an August 3, 2009 outgoing wire transaction. The court then elicited testimony from Calapini the money went to Ameritrade and appellant was the beneficiary of the account. The prosecutor asked Calapini, "If you . . . didn't want the bank looking into your business you would call it an operating account instead of a trust?" The court asked, "You mean a person that's a customer, *if they had some scheme in mind*? (Italics added.)

(b) *Tapia's Testimony*.

Los Angeles Police Officer Eugene Tapia, the investigator in this case, testified appellant was the sole account holder of the Ameritrade account and she used some of the money in that account to pay for her son's tuition. The court said, "So even if that business account was intended to be a trust account, *it wasn't dealt with as a trust account*. You formed the fact [*sic*] this money is *going to possible personal means*." (Italics added.)

Tapia testified that during his investigation he never found out who wired the money in the accounts. The court asked, "Counsel just asked you did you determine who forwarded the money to those accounts and you said you didn't know; but they were *all accounts in the defendant's name, correct, and no one else*?" (Italics added.)

Tapia testified that during his investigation he concluded appellant was involved with the theft of the money, and Tapia arrested her. Appellant then asked Tapia if there were others involved, and the prosecutor posed a relevance objection. The court said, "Sustained, unless there is a specific offer of proof that can pinpoint how it specifically relieves your client, if she is responsible. And I don't think that can be done. The issue is did she do what the People allege she did, regardless whatever everybody else may have been doing, unless somebody set her up to be the patsy. *Why they would send*

*money to her account, though, is beyond me and that's the issue,* if she is the only one who had access." (Italics added.)

(c) *Banki's Testimony*.

During direct examination, Carlo Banki, Senior Deputy Commissioner for the Department of Real Estate, testified to the effect appellant took various continuing education courses, including an ethics course and a course on handling trust funds, but her actions contradicted what she had learned. It was common that licensees who had been disciplined had taken all the continuing education courses. The court said, "Are you saying based on the classes she indicated she took such as ethics, trust fund handling and so forth, in your opinion she *wasn't too dumb to know what was right and what was wrong*?" (Italics added.)

Banki testified that in most of his investigations, the broker was simply a symbolic person who really did not know much about what the agent did. Banki also testified real estate agents were independent contractors. The court asked, "Assume for the sake of argument that the broker totally abdicates his responsibility, . . . *Does that mean that the agents can run free and do whatever they want and be blameless*?" (Italics added.)

The following occurred, "The Court: You have presented a wrath [*sic*] of documents to support the summaries on the Bank of the West statements. [¶] Are you asking a hypothetical *that has nothing to do with what's been established in this case* . . . . [¶] . . . [¶] . . . *or what the prosecution is trying to establish*? [¶] [Appellant's Counsel]: What's been established in this case is that the vast majority of the wire transfers where somebody actually walked into the bank and initiated to fill out a form for those transfers. . . . [¶] *The Court: That's possible, but that could be a front person.*" (*Sic*.) (Italics added.)

(2) *Alleged Judicial Misconduct During the Presentation of Defense Evidence*.

(a) *Appellant's Testimony*.

The challenged judicial comments discussed below mainly pertain to money, operating accounts, and escrow accounts. Appellant testified Garcia-Alonso gave a $19,800 check to her, she gave it to Panichi, the escrow officer, and he must have deposited it in the bank. The court repeatedly reminded appellant she testified Garcia-Alonso's check went into a bank rather than an escrow account. The court said, "*You said into the bank. You believe he put it into the bank?*" (Italics added.) The court asked, "*Not an escrow account?*" (italics added) and later, "*Wasn't that money supposed to go into an escrow account?*" (Italics added.) The court stated, "*And you just said 'a bank'*" (italics added) and "*And you heard it went into the bank, you just said.*" (Italics added.) The court later stated, "*But you said it went into a bank, not an escrow account*" (italics added) and "*You just said it went into a bank.*" (Italics added.)

The court asked appellant, "*Did you ever tell Alonso that you were the owner of Click and List?*" (italics added) and "*Did you ever tell him that his money would go into an escrow account?*" (Italics added.) The court also asked, "*Did he ever tell you that he wanted his down payment back because he couldn't get into the home?*" (Italics added.)

Appellant testified she found out during trial that for a few weeks she had been CFO of Click. Appellant did not know what a CFO of a real estate company did. Appellant had a real estate license but did not remember what a CFO did for a corporation. The court asked, "Are you saying you were made the chief financial officer *without ever being told it; and it is a surprise to you* when this trial began and evolved into what it has become; and by looking at this document . . . [¶] . . . [¶] . . . *for the first time you were aware* that you were a designated C.F.O.?" (Italics added.) The court commented, "*So it is all a surprise to you,*" (italics added) and asked, "*You don't know when* [*appellant's term as CFO*] *. . . began and you don't know when it ended?*" (Italics added.)

The prosecutor asked appellant, "So you felt it was permissible for you to *dip into the Click and List account* and transfer that money to your Ameritrade account without Mr. Sennette's approval?"  The court asked appellant, "*You really didn't need to because you were the C.F.O. and you were a signatory on that account, even though you claim it was just for a two- to three-week period, correct*?"  (Italics added.)  The court also asked, "Well, where do you think the money came from that went into the Click and List operational account *that . . . you were dipping into to trade to Ameritrade* or wire to Ameritrade?  [¶] . . . [¶] . . .  All right.  That you were taking from that account and transferring on your own with Mr. Sennette's approval, where did you think that money came from?  [¶] . . . [¶] . . .  And where did it come from?  Forget belonging to the company.  It is in their account.  They say possession is 9/10th of the law.  Where did it come from, did you have any knowledge, whatsoever?  [¶] . . . [¶] . . .  But you did transfer money from that account to Ameritrade?"  (Italics added.)

The court asked, "But did you ask yourself whether there was possibly trust money that was inadvertently put into the operational account, instead of a trust account, and was violating the trust agreement with clients?  [¶] . . . [¶] . . .  Did you understand my last question? . . . I asked you, did you know the source of the money that was in that account and whether it was designated to be used in a particular manner, other than . . . wiring it to Ameritrade?"  (Italics added.)

Still later, the following occurred:  "The Court:  So you are saying that they were going to pay you on an installment basis for commissions that were three, four, five years old; and whenever it came up, you would tell him, hey, I need some money, could we work it off against the commissions owed to you; is that it?  [¶] . . . [¶] . . .  Well, something to that effect.  I don't want anybody to be misled.  You tell us exactly what was understood.  [¶] . . . [¶] . . .  What are you talking about?  What was the ongoing business, the operational account or the Ameritrade?  [¶] . . . [¶] . . .  What does that have to do with you transferring money from the operational account into Ameritrade?"

Later, the following occurred:  "The Court:  I want to get something straight.  When you say your 'personal money,' . . . your personal money did come from the

commissions from your real estate transactions. You didn't have any other business when you say your 'personal money,' right? [¶] . . . [¶] . . . And you hadn't inherited that? [¶] . . . [¶] . . . And you hadn't won the lotto? [¶] . . . [¶] . . . So when you say it is all your personal money, it has come from commissions in the real estate business? [¶] . . . [¶] . . . And some of those commissions, you hadn't even yet received because you claim they had been owed to you for years, right? [¶] . . . [¶] . . . *But they weren't paying you, you were taking it yourself, correct*? [¶] . . . [¶] . . . [Sennette] said it was okay, and you would make the transfer?" (Italics added.)

Later, the court asked, "Again, why would you be sending [money] back to Click and List if it was your account? [¶] . . . [¶] . . . Let me ask you one other question. Wouldn't all the money that's coming in to pay off loans, for example, the [$]500,000 plus, with [Porter], shouldn't that have been in a separate escrow account? [¶] . . . [¶] . . . Did a bell go off or a red flag come up for you when you realized that in the operating account of this little real estate company there was hundreds of thousands of dollars? How could that be? Doesn't the money go from the escrow account to the people who were entitled to it? You got your commissions, and then, the money is disbursed to everybody in your little corporation so they can have their monthly or weekly draw. How would an account at Click and List have $500,000 in it? [¶] . . . [¶] . . . Forget the deficit. Tell me how it would be that that operating account would have a half a million dollars in it when that is money that would normally be disbursed for profits and wages? Why would there be [$]500,000 in a Click and List account? [¶] . . . [¶] . . . When you were taking money out of that account, as you say, to even a balance that was owed, . . . did you ever wonder why is there so much money in this account? Shouldn't this have been disbursed if it is profits or . . . shouldn't it have gone to escrow companies if it was escrow money? [¶] . . . [¶] . . . [Y]ou were the C.F.O?"

Later, the prosecutor asked, "On the 25th, there was only $800 in your account at the T.D. Ameritrade, after $82,000 was deposited on the 25th, is that correct . . . ?" Appellant replied yes. The following then occurred: "[By the Prosecutor:] Q You needed some more money? [¶] The Court: *If she wanted to trade*. [¶] By [The

Prosecutor]:  Q  *If you wanted to trade.  I am sorry, if you wanted to trade.*  [¶] [Appellant]:  Your Honor, that's not true.  [¶]  The Court:  I am just asking.  *Could you continue trading with that balance?  You couldn't, could you*?  [¶]  [Appellant]:  No, but it is also my personal checking account.  [¶]  The Court:  *I am not concerned about that. I just wanted to know.  Can you trade without a balance*?"  (Italics added.)

Later, the court said, "There is no law against [opening other accounts].  [The prosecutor] has asked you, is there a particular reason . . . [¶] . . . [¶] . . . why you opened up a new account?  [¶] . . . [¶] . . . *Were you trying to distance yourself from other transactions and open that new account*?  [¶] . . . [¶] . . . *So it would be harder to find what you were doing*?"  (Italics added.)

Later, the prosecutor asked, "Who would wire money to your account if you didn't do that and use that language [i.e., from Neelam Bhatia for credit to Neelam Bhatia]?"  The court asked, "Did anybody owe you money *so that you would be getting windfalls* or money owed to you from strangers or third parties?  [¶] . . . [¶] . . .  What [the prosecutor] wants to know, was this money you sent to yourself?  It didn't come from other people, did it?  [¶] . . . [¶] . . .  Was anybody sending you money?  [¶] . . . [¶] . . .  Everything you put into the accounts was from you, correct?  [¶] . . . [¶] . . .  That from Neelam Bhatia to Neelam Bhatia aside, was anybody putting in money into your accounts without your knowledge?  [¶] . . . [¶] . . . *And you were getting a windfall*?"  (Italics added.)

(b)  *Alan Wallace's Testimony.*

Alan Wallace, a defense expert, was an attorney and a real estate broker.  The court asked Wallace, "You said the broker is responsible for the trust account, correct? [¶] . . . [¶] . . .  That doesn't mean that if a licensed sales agent somehow or another was taking money from that account *by some scheme*, that that person isn't liable for criminal responsibilities.  It just means that the broker is also liable as the person responsible for the overall supervision of that."  Wallace asked if the court was asking Wallace to assume there was a trust account for purposes of the court's question, and the court said, "Yes, somehow or another, an *employee in the office was able to loot it*.  [¶] . . . [¶] . . . *By some scheme or strategy*.  They are [*sic*] held harmless because the broker is in control of

that. The broker goes down on the liability, but the person that has been taking from it can still be prosecuted." (Italics added.) Wallace replied in the affirmative.

Subsequently, the following occurred: "The Court: What if the agent isn't even getting their money for the commissions out of sales for a long time, you would expect them to not let it ride indefinitely? [¶] The Witness: You would think the agent would have said, 'Hey, what is going on here?' [¶] The Court: 'Could I see the books?' " The court later asked, "What if an agent knew that money was going into a general operating account that should be going into separate escrow accounts for individual transactions, and also knew that they hadn't been paid a lot of commissions. Are they entitled to just go into the general account with money that should have been put into escrow accounts and withdraw from that on their own, self-help? [¶] . . . [¶] . . . *You don't know of any self-help law case that says they can do that, take the law into their own hands in that regard*?" (Italics added.)

(c) *Alleged Hostility Towards Appellant and Her Counsel.*

Appellant argues the trial court was hostile to appellant and her counsel. Appellant cites the alleged instances below (not in the order in which they appear in the record).

During cross-examination of appellant, the following occurred: "The Court: What was the source of the [$225,000] that went into the Ameritrade account [and was later transferred back to Click]? [¶] . . . [¶] I mean, where did that money come from? Was that money put in by a customer? [¶] . . . [¶] . . . Or a bank on a transaction that you took out of there and put in Ameritrade? [¶] . . . [¶] . . . Listen. This case revolves around part of that account, correct? Do you understand? [¶] . . . [¶] . . . That's part of the People's case, right, the transactions that went on that Ameritrade account. [¶] . . . [¶] . . . And you say maybe this happened or maybe that happened. Have you directed your attention to that particular account and the transactions on it to make a determination as to whether or not you can specify the source of the money that went into Ameritrade and why it went out in such large sums? [¶] . . . [¶] . . . All right. I will let the lawyer ask

questions along that line. [¶] . . . [¶] . . . I don't have another question pending. I just wanted to set it up so we can get to the issues. [¶] . . . [¶] . . . If these are issues."

During cross-examination of Tapia, the following occurred concerning the issue of deposits and credits to an account: "[The Prosecutor]: . . . I object. . . . [Appellant's counsel] is misstating the issue of what credits actually mean. [¶] The Court: *I don't even know the relevancy of this*. [¶] . . . [¶] . . . *I can't fathom it*." (Italics added.)

During cross-examination, Banki asked the court if the court wanted Banki to continue testifying about the "significance of these checks pertaining to my investigation." The court later asked, "*You were saying the significance of the checks is*?" (Italics added.)

During redirect examination of Wallace, the prosecutor asked whether the record of banking transactions was preserved. The following then occurred: "The Court: You mean must they be preserved like [the] I.R.S. says, what, seven years with tax returns? [¶] [The Prosecutor]: *I know the court is clarifying the question. The question is vague.* [¶] The Court: *It is.* [¶] [The Prosecutor]: *It has nothing to do with this witness's expertise.* [¶] The Court: *I agree*."[3] (Italics added.)

During its final charge to the jury, the court, using CALCRIM No. 200, instructed the jury, "You must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." The court, using CALCRIM No. 222, told the jury, "You must decide what the facts are." The court, using CALCRIM No. 226, instructed the jury "You alone, must judge the credibility or believability of the witnesses." The court also, using CALCRIM No. 3550, cautioned the jury, "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." We will present additional facts where pertinent below.

---

**3**　　Appellant also cites various trial court comments that occurred outside the presence of the jury.

b. *Analysis.*

At the outset, we might very well have concluded as to all of the above alleged instances appellant's claim is unavailing because she waived any judicial misconduct issues by failing to object. (Cf. *People v. Abel* (2012) 53 Cal.4th 891, 914 (*Abel*).) However, we address the merits of appellant's claim to forestall a claim of ineffective assistance of counsel. (Cf. *People v. Turner* (1990) 50 Cal.3d 668, 708.)

Evidence Code section 775 provides, in relevant part, "The court, on its own motion . . . may call witnesses and interrogate them the same as if they had been produced by a party to the action, . . . ." Section 775 codifies traditional case law. Our Supreme Court has recognized it is not merely the right but the duty of a trial judge to see the evidence is fully developed before the trier of fact and to assure ambiguities and conflicts in the evidence are resolved to the extent possible. (*People v. Carlucci* (1979) 23 Cal.3d 249, 255.)

However, "Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237-1238.) "Jurors rely with great confidence on the fairness of judges, . . ." (*Id.* at p. 1233.)

Accordingly, "A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the prosecution." (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206-1207.) A trial court's behavior that conveys disdain for key defense witnesses and their testimony constitutes misconduct. (*Sturm, supra,* 37 Cal.4th at p. 1240.) Similarly, "A trial court commits misconduct if it ' "persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge." ' " (*Id.* at p. 1238.)

A trial judge " 'must not become an advocate for either party or under the [guise] of examining witnesses comment on the evidence or cast aspersions or ridicule on a witness.' " (*People v. Cummings* (1993) 4 Cal.4th 1233, 1305.) "The trial judge's

interrogation 'must be . . . temperate, nonargumentative, and scrupulously fair. . . . ' [Citation]." (*People v. Hawkins* (1995) 10 Cal.4th 920, 948; accord, *People v. Harris* (2005) 37 Cal.4th 310, 350 (*Harris*); see Cal. Code Jud. Ethics, canon 3B(5) ["A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, engage in speech, gestures, or other conduct that would reasonably be perceived as (1) bias or prejudice, . . ."].)

We have set forth the trial court's examination of witnesses. The examination reflected ridicule, indicated to the jury the court's convictions, and contained persistent discourteous and disparaging remarks that discredited the defense and created the impression the court was allying itself with the prosecution. The court's questions and comments also reflected disdain for defense favorable testimony, and plainly conveyed the court did not believe such testimony. We hold the trial court's examination of witnesses constituted judicial misconduct.[4]

However, our analysis does not end there, because " ' "we must determine whether the judge's behavior was *so prejudicial* that it denied [the defendant] a fair, as opposed to a perfect, trial." ' [Citation.]" (*Abel*, *supra*, 53 Cal.4th at p. 914, italics added.) Our Supreme Court stated in *Abel*, "We make that determination on a case-by-case basis, examining the context of the court's comments and the circumstances under which they occurred. [Citation.] Thus, the propriety and prejudicial effect of a particular comment are judged by both its content and the circumstances surrounding it. [Citation.]" (*Ibid*.)

In *Harris,* the Supreme Court considered the above prejudice determination in the context of a defendant's claim the trial court exhibited judicial bias during the court's examination of the defendant. (*Harris*, *supra*, 37 Cal.4th at pp. 346, 348.) The defendant claimed on appeal "the court overstepped its bounds with respect to the tone, form, and number of questions posed." (*Id*. at p. 350.)

---

[4] Appellant asserts the trial court had a sua sponte duty to curb prosecutorial misconduct. The trial court had no such duty. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1153; *People v. Jones* (1997) 15 Cal.4th 119, 182.)

*Harris* stated it did not endorse some of the questions of the trial court in that case, and other questions of the trial court were inappropriate. (*Harris*, *supra*, 37 Cal.4th at p. 350.) Nonetheless, *Harris* stated, "On the facts of this case, . . . we find no prejudice. We must assume that jurors followed their instruction not to 'disbelieve any witness' or to decide the facts based on anything the court said or did, and to disregard any intimations or suggestions the court may have made regarding the believability of any witness. (CALJIC No. 17.32.) Further, the evidence of guilt was strong and the weaknesses in defendant's assertions of innocence would have been apparent to the jury even absent the court's questions. It is not reasonably probable the jury would have reached a different guilt verdict had the court refrained from asking these questions. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)" (*Id.* at pp. 350-351.)

Similarly, in the present case we must assume that jurors followed the court instructions set forth in CALCRIM Nos. 200, 222, 226, and 3550, previously discussed. (Cf. *Abel, supra*, 53 Cal.4th at p. 916.) In the last of these, the court told the jury, "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." Our Supreme Court has described the presumption jurors understand and follow instructions as the " 'crucial assumption underlying our constitutional system of trial by jury.' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Indeed, at the beginning of the trial, the court told the jury not take to anything the court said or did during the course of the trial as an indication of what the court thought about the facts, witnesses, or what the verdict should be. The court indicated it would ask questions from time to time if it thought something was ambiguous or needed to be clarified. Both at the beginning of trial, and during recesses, the court repeatedly told the jury to keep an open mind. The court indicated in the jury's presence multiple times the jury was the final arbiter of the facts and outcome. We also note appellant's citations of misconduct comprise about 22 pages of her opening brief, as compared with over 3,900 pages of trial proceedings reflected in nine volumes of the reporter's transcript.

Further, in the present case the evidence of guilt was strong and the weaknesses in the defense case would have been apparent to the jury even absent the court's conduct. There is no dispute as the sufficiency of the evidence supporting appellant's convictions in this case. Beyond that, appellant concedes evidence was introduced that between December 2008 and September 2009, about $1.6 million was wired from Click's operating account into an Ameritrade account with respect to which appellant was the sole beneficiary. Appellant testified she was just a real estate agent, but a Secretary of State form reflected she was CFO and secretary of Click. Appellant testified she had nothing to do with escrow, but Christian Asouad, the president of a loan company that transacted business with Click, testified, "Joe Panichi, the escrow officer, was out of the picture" and appellant was "my new escrow officer." In connection with the Patel transaction, appellant signed a refund check for escrow fees, as well as a $50,000 check to Porter as a partial payment.

Moreover, Houshmand testified that after she paid money to buy the Porter Ranch house, appellant and her husband came to Houshmand's home on August 31, 2009, and said Houshmand's "money by mistake went to other accounts" and they were "raising fund[s] in the office." Appellant said she would sell her gold and close the deal for Houshmand.

On September 2, 2009, Houshmand went to Click's office and spoke with appellant, her husband, and Sennette in an effort to get Houshmand's money back. Appellant, her husband, and Sennette were smiling while Houshmand was crying and shaking. Houshmand testified that later that evening, appellant called Houshmand and said, "we found the money. . . . We are wiring the money to the title company to close the deal." The deal never closed.

Appellant testified she knew as early as 2005 that funds had been misappropriated from Click's escrow division and "a lot of money [was] missing from every file." The $50,000 check appellant had signed as a refund to Porter was dated January 14, 2009, i.e., prior to the grand thefts at issue in counts 2 through 6. It is not reasonably probable the jury would have reached a different guilt verdict had the court refrained from its conduct.

No prejudicial judicial misconduct or violation of appellant's right to a fair trial occurred.[5]

2. *The Jury Properly Convicted Appellant on Counts 2 Through 6.*

    a. *Pertinent Facts.*

The information alleged six counts of grand theft. Count 1 alleged on or about December 9, 2008, appellant committed grand theft of $573,253.53 from Porter. Count 2 alleged on or about January 19, 2009, appellant committed grand theft of $19,800 from Garcia-Alonso and Martinez. Count 3 alleged on or about March 24, 2009, appellant committed grand theft of $112,000 from Garcia-Alonso and Martinez. Count 4 alleged on or about April 10, 2009, appellant committed grand theft of $40,000 from Bidgoli and Houshmand. Count 5 alleged on or about August 19, 2009, appellant committed grand theft of $198,238 from Bidgoli and Houshmand. Count 6 alleged on or about July 23, 2009, appellant committed grand theft of $39,000 from Shelden.

The information "further alleged as to counts 1, 2, 3, 4, 5 *and* 6 that in the commission of the above offenses the said . . . [appellant], with the intent to do so, took, . . . property of a value exceeding $200,000, within the meaning of Penal Code section 12022.6, subd. (a)(2)." (Italics added.) The information also alleged the crimes had "the material element of fraud and embezzlement" (*sic*) and involved a pattern of related felony conduct involving the taking of more than $500,000 (Pen. Code, § 186.11, subd. (a)(2)).

The court, using a modified CALJIC No. 3220, instructed the jury as to the Penal Code section 12022.6 enhancement allegation the jury could aggregate the loss suffered

---

[5]     On February 28, 2013, this court granted appellant's request that this court take judicial notice of: (1) the March 16, 2011 formal public admonishment of Judge Harvey Giss by the Commission on Judicial Performance, (2) the unpublished opinion in *People v. Lorta* (May 18, 2009, B200270) [nonpub. opn.], (3) the unpublished opinion in *People v. Johnson* (Sep. 8, 2010, B215843) [nonpub. opn.], and (4) the unpublished opinion in *People v. Coakley* (Oct. 23, 2012, B231522) [nonpub. opn.], each of which documents was attached to appellant's request. We have considered these documents; in any event, our holding would be the same without them.

by each victim to determine whether total losses to all victims exceeded $200,000 if, inter alia, the losses "arose from a common scheme or plan." During jury argument, the prosecutor argued the present offenses were grand thefts based on a theory of embezzlement, not larceny. The prosecutor asked the jury to aggregate the losses on counts 1 through 6 and commented that, if the jury did so, total losses would exceed $200,000.

The jury convicted appellant on counts 1 through 6, found true "in the commission of counts 1, 2, 3, 4, 5 *and*/or 6" (italics added) appellant, with intent to do so, "took . . . property of a value exceeding $200,000.00, within the meaning of Penal Code Section 12022.6, subdivision (a)(2)," and found true the Penal Code section 186.11, subdivision (a)(2) embezzlement enhancement allegation.

b. *Analysis.*

Appellant, relying on *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), presents related claims her convictions on counts 2 through 6 must be reversed and, if not, her convictions on counts 3 and 5 must be reversed. We reject the claims.

In *Bailey*, the court stated, "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and *a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan.*" (*Bailey, supra,* 55 Cal.2d at p. 519, italics added.) We refer to the above italicized language as the "multiple conviction rule."

The language of the multiple conviction rule suggests takings that are from the *same* person, that *are not* separate and distinct, *and* that *are* committed pursuant to one intention, one general impulse, and one plan *can* constitute one grand theft offense. However, we conclude, for the two reasons below, *Bailey* does not bar appellant's multiple grand theft convictions on counts 2 through 6.

First, as to some of counts 2 through 6, the underlying grand theft was not from the "same person," i.e., some counts involved different victims. As to count 1, appellant

committed grand theft from Porter (i.e., Porter was the victim as to that count). As to counts 2 and 3, appellant committed grand theft from Garcia-Alonso and Martinez together. As to counts 4 and 5, appellant committed grand theft from Bidgoli and Houshmand together. As to count 6, appellant committed grand theft from Shelden.

In sum, *Bailey* does not bar appellant's convictions on (1) count 1, (2) *one* of counts 2 and 3, (3) *one* of counts 4 and 5, *and* (4) count 6, because those four convictions do not involve takings from the "same person[s]." *Bailey* does not hold such multiple convictions are improper. (Cf. *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149 ["[a]pplication of *Bailey* has also generally been limited to thefts involving a single victim"]; *People v. Garcia* (1990) 224 Cal.App.3d 297, 308; *People v. Church* (1989) 215 Cal.App.3d 1151, 1158 ; see *In re David D*. (1997) 52 Cal.App.4th 304, 309-310 (*David D.*).)

*People v. Brooks* (1985) 166 Cal.App.3d 24 (*Brooks*), cited by appellant and discussed *infra*, does not compel a contrary conclusion. *Brooks*, which relied on *Bailey*, noted that *Brooks's* conclusion that reversal of 13 of 14 convictions for grand theft (in a case in which the thefts were the product of a general intent or overall plan) was not altered by the fact there were multiple victims (*Brooks*, at p. 31). However, in *Brooks* (unlike in the present case) all thefts had occurred *from a single fund* to which all of the victims had contributed. (*Ibid.*)

Although appellant cites cases suggesting in dicta that, under *Bailey*, takings from multiple victims could constitute one grand theft offense (*In re Arthur V*. (2008) 166 Cal.App.4th 61, 68-69, fn. 4; *David D.*, *supra*, 52 Cal.App.4th at p. 309, fn. 3), appellant cites no case holding *Bailey* requires this when, as here, the victim(s) as to each count *exclusively possessed* the personal property taken from said victim(s).

The second reason we conclude *Bailey* does not bar appellant's multiple grand theft convictions on counts 2 through 6 is each theft underlying each count was "separate and distinct." *Bailey* cited *People v. Stanford* (1940) 16 Cal.2d 247 (*Stanford*), which, like the present case, was a real estate fraud case. In *Stanford*, an attorney was a trustee of a trust account containing a client's funds that the attorney was to use to buy property

for the client. The attorney misappropriated the funds and bought property for himself. The attorney did so by drawing a $500 check against the account on July 18, 1936 (count 1), drawing about $7,500 from the account on July 26, 1936 (count 2), and later drawing from the account sums totaling about $2,000 (count 3). (*Stanford*, *supra*, 16 Cal.2d at pp. 249-250.) The attorney was convicted on all three counts.

*Stanford* stated, "There is no merit in appellant's contention that the entire transaction could not constitute more than one offense, and that the conviction of three separate offenses was error. . . . In the present case the evidence showed that the thefts referred to in the first three counts of the indictment were *separate and distinct* transactions, which occurred on *different dates*, and involved the taking of *different sums* of money. *Such separate transactions constituted separate offenses*. [Citations.]" (*Stanford*, *supra*, 16 Cal.2d at pp. 250-251, italics added.)[6] *Stanford* upheld the three convictions. (*Id*. at p. 252.)

In the present case, each of the thefts referred to in counts 1 through 6 were separate and distinct transactions occurring on different dates and involving the taking of different sums of money. Moreover, the means by which appellant accomplished the thefts, as well as what the proceeds represented, frequently differed. As to count 1, the $573,253.53, part of the purchase price, was wired. As to count 2, the $19,800, a deposit, was in the form of a check. In count 3, the $112,000, the balance of a down payment,

---

[6]     *Stanford* also stated, "While transactions in series have frequently been held to constitute but parts of one continuous proceeding, and hence but one offense, this result is more commonly reached in cases of larceny than in those of embezzlement. This follows from the fact that in the crime of larceny the defendant has obtained possession of his victim's property by wrongful means, and completion of the offense is not dependent upon whether he thereafter appropriates the fruits of his theft by a single act or at successive intervals. On the other hand, in the case of an embezzlement, the property is already in the rightful possession of the defendant, and his subsequent fraudulent appropriation is of the essence of the crime. [Citation.]" (*Stanford*, *supra*, 16 Cal.2d at p. 251.) In the present case, the prosecutor's jury argument and the jury's finding as to the Penal Code section 186.11, subdivision (a)(2) enhancement implied the People's theory of prosecution, and the jury's finding, respectively, were that the grand thefts in this case were embezzlements.

was in the form of a cashier's check. In count 4, the $42,000, a deposit, was in the form of a check. In count 5, the $198,238, the balance of a down payment, was wired. In count 6, the $39,000, a deposit, was in the form of a check. As to counts 2 and 3, the money was actually paid by different persons; Garcia-Alonso gave appellant the $19,800 check but Martinez gave appellant the $112,000 cashier's check. As to counts 1, 2, 3, 4, and 6, the moneys were deposited into Click's operating account at West, while, as to count 5, the money was wired into Click's operating account at Chase.

In sum, *Bailey* does not bar appellant's convictions on counts 2 through 6 because appellant's takings as to counts 1 through 6 were "separate and distinct."**[7]**

Appellant, citing *People v. Richardson* (1978) 83 Cal.App.3d 853 (*Richardson*), *People v. Packard* (1982) 131 Cal.App.3d 622 (*Packard*), *Brooks, supra,* 166 Cal.App.3d 24, and *People v. Kronemyer* (1987) 189 Cal.App.3d 314 (*Kronemyer*), argues she committed a single grand theft offense. However, *Richardson* involved convictions for *attempted* grand theft, and neither *Richardson*, *Packard*, *Brooks*, nor *Kronemyer* (the last three of which involved multiple grand theft convictions) discussed whether takings were "separate and distinct" for purposes of *Bailey*. Indeed, in light of the facts in *Packard*, *Brooks*, and *Kronemyer*, those three cases very well might have concluded that some or

---

**7**     We assume without deciding the jury's true finding as to the Penal Code section 12022.6, subdivision (a)(2) *enhancement* allegation, including its allegation appellant "*took* . . . property of a value exceeding $200,000.00," implied a finding appellant committed the *six grand theft offenses* pursuant to a "common scheme or plan," and that this in turn implied a finding appellant committed the six grand theft offenses pursuant to one intention, one general impulse, and one plan for purposes of *Bailey*. Nonetheless, even if appellant committed the six grand theft offenses pursuant to one intention, one general impulse, and one plan, appellant's multiple convictions on counts 1 through 6 were proper because they were "separate and distinct." Otherwise, for example, a defendant who, over a period of 20 years, stole, annually and at different locations, different kinds of property would be liable for only one grand theft offense simply because all of the takings were pursuant to one intention, one general impulse, and one plan.

all of their respective takings were not "separate and distinct" had those cases discussed the issue.[8]

3. *No Ineffective Assistance of Counsel Occurred.*

Appellant claims her trial counsel provided ineffective assistance of counsel by failing to object during the following colloquies.

During Banki's direct examination by the prosecutor, Banki testified concerning the impropriety of commingling trust funds. The following later occurred: "[By the Prosecutor:] Q *If you put it into a T.D. Ameritrade account and you start to pay your child's tuition that's theft, right*? [¶] A. *Yes.* I'm involved only to the point of revocation of that person's license. The theft is criminal. As far as [the Department of Real Estate] is concerned I have to make that distinction." As to this testimony, the court explained, "[Banki is] testifying because this is a subject matter that's beyond common knowledge and requires some sophistication to know and understand. [¶] He's not stating at this time that she committed theft. That will be for the jury to decide. [¶] You will get instructions defining what the definition of theft and/or embezzlement is, and you will make your decision when it's the appropriate time whether or not those instructions apply to this case and how they apply. [¶] So I just want it understood that this witness was giving a hypothetical response and was not usurping the power of the jury when he said something is theft." (Italics added.)

---

[8] Appellant claims the trial court erroneously failed to instruct sua sponte her thefts were pursuant to one intention, one general impulse, and one plan. Even assuming this issue was not a defense with the result any trial court duty to so instruct would have arisen only in response to a defense request for such an instruction, and even assuming the trial court could not have rejected such a request on the ground such an instruction would have been inconsistent with appellant's claim-of-right defense, no prejudicial error resulted, under any conceivable standard, from the alleged trial court error. As discussed, multiple convictions were proper because the underlying offenses were "separate and distinct" whether or not appellant committed them pursuant to one intention, one general impulse, and one plan. The issue of whether a defendant was properly sentenced on multiple counts of grand theft or whether the defendant's multiple takings constituted a single offense under *Bailey* is presently pending before our Supreme Court in *People v. Whitmer*, review granted May 1, 2013, S208843.

During cross-examination of Banki by *appellant's counsel*, Banki testified to the effect during the investigation he revoked the broker's license for the broker's lack of supervision, and revoked appellant's license for violations of the real estate commissioner's regulations. The following then occurred: "[By Appellant's Counsel:] Q When you say her lack of supervision, . . . when the complaint came in were you looking at fraud? [¶] A Yes. [¶] Q . . . And during the course of your investigation when it was all finalized was fraud included? [¶] A Yes. [¶] Q Or was it just negligence? [¶] A . . . [T]he accusation that I filed on this case there is many violations, one of which was 10176(a), which under Business and Professions Code is *misrepresentation and fraud*. It's like dishonest acts." (*Sic*.) (Italics added.)

Appellant claims her trial counsel provided ineffective assistance of counsel by failing to object to (1) Banki's direct examination testimony "suggest[ing]" appellant was guilty of theft and (2) Banki's cross-examination testimony appellant was "guilty of fraud and misrepresentation." Appellant suggests Banki made other improper comments. None of appellant's arguments have merit. The record sheds no light on why appellant's trial counsel failed to act in the manner challenged, the record does not reflect said counsel was asked for an explanation and failed to provide one, and we cannot say there simply could have been no satisfactory explanation. (Cf. *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.)

Moreover, as to Banki's direct examination testimony, he answered a hypothetical question and did not testify appellant committed the crime of theft. Fairly read, Banki's testimony on that issue indicated he was not concerned with a criminal action but only a real estate license violation. The trial court's jury admonition concerning Banki's answer cured any harm.

As to Banki's cross-examination testimony, he did not testify appellant was guilty of the crimes of fraud and misrepresentation. After appellant's counsel effectively asked if Banki had concluded during his investigation that only negligence had occurred (a question apparently intended to minimize evidence of criminality), Banki testified he filed an accusation concerning a specified code section. The court gave instructions to

the jury concerning witnesses and expert witnesses.[9]  We presume the jury followed the instructions.  We reject appellant's ineffective assistance claim as to any of the challenged testimony of Banki.  (See *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

4.  *No Prejudicial Prosecutorial Misconduct Occurred.*

Appellant claims the prosecutor committed misconduct during his cross-examination of appellant, and during opening argument, as follows.

a.  *The Prosecutor's Cross-examination of Appellant.*

During cross-examination, appellant testified she lived in the same house with her husband and would talk to him about her daily business.  The following then occurred (and we emphasize below what appellant emphasizes):  "[By the Prosecutor:]  Q  And would you have occasion to talk about your finances?  [¶]  A  Yes, being my personal money and being my personal accounts, what has that got to do with Click and List?  [¶]  Q  My question to you -- it has everything to do with Click and List.  More importantly, it has *everything to do with every victim in this case that is out of their lifetime savings.*  That's what it has to do with.  You asked me a question.  Okay.  [¶]  Now, let's just look at the month of January of 2008.  By the way, I have a question to ask you.  [¶]  Do you *have any sympathy towards any of the victims in this case*?  [¶]  A  Absolutely."

Appellant claims the above italicized comments of the prosecutor were misconduct.  First, appellant failed to object on the ground of prosecutorial misconduct and failed to request a jury admonition with respect to the prosecutor's comments, which would have cured any harm.  Appellant waived the issue of prosecutorial misconduct. (Cf. *People v. Gionis* (1995) 9 Cal.4th 1196, 1215; *People v. Mincey* (1992) 2 Cal.4th 408, 471.)  Moreover, in light of all of the evidence in this case, we see no reasonable probability the prosecutor's brief and isolated comment or the prosecutor's question

---

[9]     During its final charge, the court instructed the jury with a modified CALCRIM No. 226 (regarding witnesses), and a modified CALCRIM No. 332 (regarding expert witnesses).

could have influenced the jury's guilt determination. (Cf. *People v. Medina* (1995) 11 Cal.4th 694, 760.)

b. *The Prosecutor's Opening Argument.*

During the prosecutor's opening argument, the prosecutor commented to the effect (1) appellant testified she was entitled to the money because she was entitled to commissions, but (2) the real crux of the case was appellant did not introduce a single document to support that testimony. The prosecutor also commented he would read some jury instructions about that issue. The prosecutor then stated, "But I want to also say to you that if the prosecutor, that being me, gets a little animated and I do often, I want to say to you that trying to chase this mouse down the street hasn't been easy. . . . And if I get animated and because *it's been a long time coming, there is a lot of people that are hurt in this.*" (*Sic.*) The court interrupted and asked whether by the word "mouse," the prosecutor was referring, not to appellant, but to the issue, and the prosecutor replied yes.

Later, the prosecutor, reviewing evidence concerning counts 1 through 5, commented as follows. Appellant had Houshmand wire the $198,238 to Chase instead of West so the money would not be traced. As soon as Houshmand wired that money, checks were drawn against it with an illegible signature and it was "that bad of a theft." The prosecutor then stated, "What is worse about it is that *the defendant in this case needs to be held accountable for a variety of reasons. And one of them is because of the amount of people that she harmed.* I don't know what is worse, literally hurting someone physically or hurting them financially for the rest of their life. . . . Neither one are good. But they are certainly comparable." (*Sic.*)

The prosecutor later commented to the effect the testimony best demonstrating appellant lacked a good faith belief that she was entitled to the money going into Ameritrade "is "[P]oor Mr. Garcia Alonso . . . [who] gave all his money for this, to purchase a home for his family. . . . [¶] . . . And I thought he was a great guy. He was polite. He was decent, honest, meaningful. And basically . . . testifies that there were two deposits, . . . $19,800, and $112,200. That he never got the correct paperwork. . . . [H]e was given a temporary occupancy and the keys and went in. That he lived there

with his family, until finally he was told, you gotta move, you are being evicted. The escrow didn't go through. [¶] We know . . . from the bank records. He was out with his kids and he had to leave our state because he can't live here because it is too expensive because all his money is in her pocket. [¶] Also some degree to my animation. *It makes me angry. It's not right*." (*Sic*.)

Appellant claims the above italicized comments of the prosecutor were misconduct. Appellant waived the issue by failing to object on the ground of prosecutorial misconduct and by failing to request a jury admonition with respect to the prosecutor's comments, which would have cured any harm. As to the merits, the challenged comments were not misconduct but were fair comment on the evidence. (See *People v. Hill* (1998) 17 Cal.4th 800, 819.)[10]

5. *The Abstract of Judgment Must Be Corrected.*

The court sentenced appellant to prison for nine years eight months. The abstract of judgment reflects the sentence as nine years four months. Respondent claims the abstract of judgment must be corrected. We agree. (Cf. *People v. Humiston* (1993) 20 Cal.App.4th 460, 466, fn. 3.) We will direct the trial court to do so.

---

[10]  In light of our above discussion of appellant's claims, we reject her additional claim the trial court committed prejudicial cumulative error.

## *DISPOSITION*

The judgment is affirmed.  The trial court is directed to forward to the Department of Corrections an amended abstract of judgment reflecting appellant's total prison sentence is nine years eight months.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.